IDA LEFFEN ET AL., Appellants, v. HURLBUT-GLOVER MORTUARY, Inc., Respondent, No. 42851—257 S. W. (2d) 609.

Division One, April 13, 1953.

Motion for Rehearing or to Transfer to Banc Overruled, May 11, 1953.

1138

*Watson, Richart & Titus, Ray E. Watson, F. H. Richart* and *Rex B. Titus* for appellants.

*Max H. Glover, William O. Russell* and *Burden & Shortridge* for respondent.

LOZIER, C.—This is an action to restrain the operation and maintenance of a funeral home in the City of Joplin. The theory of plaintiffs-appellants (herein called plaintiffs), home-owning residents of the particular district or area, was that defendant's maintenance and operation of the funeral home constituted a nuisance. Plaintiffs did not ask for damages. Plaintiffs have appealed from an order denying the injunction and dismissing their petition.

There are no estoppel or laches issues. Restrictive covenants are not involved. See 14 Am. Jur., Covenants, Conditions and Restrictions, Sec. 261, p. 637; Anno. 165 A.L.R. 1131; Scallet v. Stock, 363 Mo. 721, 253 S. W. 2d 143. As submitted, both below and upon this appeal, the case does not involve municipal zoning. See 58 Am. Jur., Zoning, Secs. 3 and 116, pp. 941 and 1006; 39 Am. Jur., Nuisances, Sec. 46, p. 328; Scallet v. Stock, supra.

Defendant purchased and remodeled (under a permit issued under the city's building code) one of Joplin's fine old homes and began to operate the funeral home on or about February 1, 1948. By trial time (December 7, 1948), 135 funerals had been conducted there. The record shows that defendant was operating its funeral home in a proper manner and by the most modern and approved methods. Plaintiffs' evidence was that the value (for residence [610] purposes) of each of their respective properties had been depreciated in excess of $7500. Defendant's evidence was that such values (for business or commercial purposes) had been increased.

Plaintiffs pleaded and submitted their case primarily upon the theory that the "neighborhood" was "purely and strictly, a residential neighborhood"; that the maintenance and operation of the funeral home constituted a nuisance because of the "constant reminders of death" to plaintiffs and members of their families, affecting "enjoyment of their homes, repose, peace and happiness," and causing "depression of mind and mental anguish." The record contains sufficient substantial evidence that the maintenance and operation of the funeral home, in a proper manner, did have such "depressive effects."

"The greater weight of recent authority is to the effect that the establishment and operation of an undertaking business in a purely residential section, under circumstances which would cause a depressed feeling to the families in the immediate neighborhood,

and a constant reminder of death, appreciably impairing their happiness, or weakening their power to resist disease, and depreciating the value of their property, constitutes a nuisance." 87 A.L.R. 1061, 1062. See also 66 C.J.S., Nuisance, Sec. 72, p. 819; 54 Am. Jur., Undertakers and Embalmers, Sec. 7, p. 512. And see cases discussed in Jack v. Torrant, 136 Conn. 414, 71 A. 2d 705 (majority rule); Dawson v. Laufersweiler, 241 Iowa 850, 43 N.W. 2d 726 (minority rule). , This court has followed the majority rule. Tureman v. Ketterlin, 304 Mo. 221, 263 S. W. 202, 43 A.L.R. 1155; Streett v. Marshall, 316 Mo. 698, 291 S. W. 494; Clutter v. Blankenship, 346 Mo. 961, 144 S. W. 2d 119. And see Scallet v. Stock, 363 Mo. 721, 253 S. W. 2d 143.

██ The trial court's sole finding was "that the area at and surrounding" the street intersection at which the funeral home is located, "being the neighborhood described in plaintiffs' petition, is not strictly and exclusively a residential district." The principal questions here are: What constituted the "district" in which the funeral home is located and what was the character of that district?

The facts material to the determination of these issues are not controverted. The two principal north-south business streets in "downtown" Joplin are Main and Joplin Streets. Fourth and Main is "the main intersection in Joplin." U. S. Highways 66 and 71 are routed over Main. Joplin Street is one block west of Main. The city hall is on Joplin. The nine north-south streets west of Joplin are, in this order: Wall, Pearl, Byers, Moffet, Sergeant, Jackson, Connor, Gray and Picher. The instantly involved east-west streets crossing Main and Joplin are, in this order, north to south: Second, Third, Fourth, Fifth, Sixth and Seventh. Fourth and Seventh are the only "through trafficways" between the city's east and west corporate limits, and, are "the principal streets running through that part of town."

Defendant's funeral home is at the northwest corner of Fifth and Sergeant. Plaintiffs are the respective owners of, and reside in homes on, thirteen tracts. One of the plaintiffs owns another residence which he rents for residence purposes. Most of the plaintiffs have lived in their present homes for many years. Several of the homes are fine old residences, originally among Joplin's best. Three of the homes are in the same block as the funeral home, two directly west across the north-south alley. One is at the southwest corner of Fifth and Jackson. One is at the southwest corner of Fifth and Sergeant, directly south of and across the street from the funeral home. Two are at the northeast and northwest corners of Fourth and Sergeant. Three (constituting the entire west front footage of the block) are on the east side of Sergeant between Fourth and Fifth, the south two directly east of and across the street from the funeral

home. The other four tracts are on the east side of Sergeant between Fifth and Sixth.

Plaintiffs' Exhibit 14 shows the area within a circle, the center of which is the middle of the funeral home tract and the diameter of which is one-quarter mile. In the circle are 88 residences (including 2 duplexes, [611] plaintiffs' 14 residences, and the residences of two dentists and a doctor whose offices are in their homes), 2 vacant lots and 10 apartment buildings or residences converted to 2 or more apartments, including the residence immediately north of the funeral home. Two of the apartment buildings contain 50 and 35-40 units, respectively. In the circle are a two-doctor medical clinic, a coffee shop, the General Hospital, a cleaning shop, a church, two dentists' homes (and offices therein), a doctor's home (and office therein), a music studio (in a residence in the same block as the funeral home), and the Y.W.C.A.

Plaintiffs' Exhibit 15 is the area bounded by the south line of Third, the west line of Byers, the north line of Seventh and the east line of Connor, 16 square blocks. This area includes the area in the Exhibit 14 circle. The Fifth and Sergeant intersection is almost the exact center of this area. (The two blocks south of Fifth are longer, north and south, than the two north of Fifth.) Exhibit 15 does not show the improvements on the south side of Seventh. On the north side of Seventh between Byers and Connor are 6 residences, 2 apartment buildings, 2 filling stations, a fruit stand, a grocery store, a large market with parking lot, an antique shop and a cleaning shop. In addition to these items on the north side of Seventh, there are in the Exhibit 15 area 141 residences (including 3 duplexes, plaintiffs' 14 residences and the residences of the two dentists and the doctor whose offices are in their homes)', 4 vacant lots and 20 apartment buildings. Exhibit 15 also shows these items (additional to items shown on Exhibit 14): A church, an insurance agency, a pastry shop, a foods cold storage plant, a large cafe and a beauty shop.

Defendant's Exhibit E shows the area between the south line of Second, the west side of Wall, an east-west line south of the south line of Seventh and the east side of Picher. This area, 5 blocks wide north-south and 8 blocks long east-west, contains 40 square blocks. A railroad right of way crosses the area between the Fifth-Picher and the Seventh-Connor intersections. Exhibit E shows Exhibits 14 and 15 areas and four adjoining areas. On the north, northeast and northwest, is the area between Wall and Picher, 8 square blocks. In this northerly area are 39 residences, 44 apartment buildings (or houses in which rooms are rented), a laundry, a dry cleaning establishment, a store, an office and the Red Cross Building. The additional area on the south includes some of the improvements on the south side of Seventh, viz.: Four apartment buildings, 3 filling stations,

1142

a cleaning shop, two churches, a tourist home, two garages, a liquor store, a title company and a market. Each of the additional areas on the east and the west is two blocks wide. In the additional westerly area (Third-Connor-Seventh-Picher) are 19 residences, 4 apartment buildings, a duplex, a dairy, a storage lot, a parking lot, a telephone warehouse building with storage lot, a storage building, a roofing company, a coal yard, a delivery service and a school. In the additional easterly area (Third-Wall-Seventh-Byers) are: Fourteen residences, 1 duplex, 2 vacant lots, 75 "apartments" or "rooms" or "apartments and rooms," filling stations, Junior College and cafeteria in separate building, markets, hotels, cafes, automobile sales rooms, parking lots, doctors' offices, 5 churches, Elks Club, stores and shops, used car lots, an undertaking establishment, the Scottish Rite Building, the Y.M.C.A., auto repair shops, refrigerator repair shops, a coffee shop, and auto parts shops. There are only three private homes on the west side of Wall between Second and Seventh; the rest of that side (and presumably the other side) of the street is entirely commercial. Between Wall and Byers, the south side of Fourth and both sides of Fifth are clearly commercial. Sixth and Seventh between Wall and Byers are almost exclusively commercial.

For fifty years, the general movement of business and commerce has been to the south and west—especially to the west—from the "downtown" business district of which the Main-Third intersection was originally the center. The area for several blocks east of Wall, almost entirely commercial, is Joplin's principal business district. It was not disputed that this general westward movement continues.

 "What constitutes a residential district which affords a basis for injunctive relief under the rule naturally defies precise definition * * *. Not only is the extent to which nonresidential uses exist a factor but there is the further question as to how extensive the area embraced in a residential section shall be." Jack v. Torrant, 136 Conn. 414, 71 A. 2d 705, 710[14]. "There is no fixed or arbitrary rule, however, governing cases of this kind. Each case must be determined by the facts and circumstances developed therein." Beisel v. Crosby, 104 Neb. 643, 178 N. W. 272, 273. Whether "the locality" is strictly residential in character is primarily a factual question. Weinmann v. Miles, 134 Kan. 107, 4 P. 2d 437, 439[1, 2]. See also Bragg v. Ives, 149 Va. 482, 140 S. E. 656, 660[3, 5].

"We have never attempted to state what an exclusively or predominantly residential district should consist of, nor can it be accurately done. * * * A district composed of one-family dwellings, churches, library, with an occasional grocery store, doctors' and lawyers' offices in homes would unquestionably compose an exclusively residential district * * *." Burke v. Hollinger, 296 Pa. 510, 146 A. 115, 117[4-6] (involving a public garage). "We concur in the conclusion of the learned trial judge that the fact that one or more

of the residences in the neighborhood have been, in part, converted into apartments to be used as places of residence, and that one is used as a boarding house, is not such a change as to deny to the district * * * the character of a strictly residential district * * *." Laughlin, Wood & Co. v. Cooney, 220 Ala. 556, 126 So. 864, 865[1]. The presence of churches do not tend to destroy a neighborhood's residential character. Clutter v. Blankenship, 346 Mo. 961, 144 S. W. 2d 119, 121[2]; Fraser v. Fred Parker Funeral Home, 201 S. C. 88, 21 S. E. 2d 577, 579[1].

Defendant cites District of Columbia v. Wardell (C.A., D.C.), 122 F. 2d 202, and Littlehales v. District of Columbia (C.A., D.C.), 130 F. 2d 402, wherein it was held that rentals from apartment houses were income derived from a "business * * * or commercial activity" carried on "for gain" under the District of Columbia Revenue Act, 50 Stat. 673, 688, D. C. Code Supp. III, Tit. 20, Sec. 970(d). No doubt the owner or operator of an apartment building is engaged in and derives an income from "business" or "a commercial activity." But it does not follow that, absent zoning or a restrictive covenant, the apartment building itself is of a business or commercial character, or that the use of the apartments as homes makes the building commercial. Similarly, rental of rooms in a private home does not change the obviously residential character of that home. See Lyon v. Files, 50 Tex. Civ. App. 630, 110 S. W. 999. (We consider inapplicable cases, cited by both parties, involving the construction, remodeling or use of buildings upon lands under restrictive covenants relating to residence, business or commercial uses. In each such case, the permissible user, a contractual matter, is both contingent upon the language of the particular covenant involved, and is enforceable as to a specific building in a nonresidential area.)

We find no merit in defendant's contention that the instant "district" is the 40-square-block area shown on defendant's Exhibit E. "The question for decision is not what is the condition of districts north or south or east or west of this district, but what is the character of the particular district involved." Dillon v. Moran, 237 Mich. 130, 211 N. W. 67[3].

The Exhibit 14 circle area is much larger than those involved in three cases in which operation of the funeral home was enjoined. In Tureman v. Ketterlin, 304 Mo. 221, 263 S. W. 202, the area was 2½ blocks long and 2 blocks wide. In Streett v. Marshall, 316 Mo. 698, 291 S. W. 494, the funeral home and plaintiffs' homes were on either side of a street in a single block in a 1-block-wide-and-6-block-long area. And in Clutter v. Blankenship, 346 Mo. 961, 144 S. W. 2d 119, plaintiffs' homes were all within a block of the street intersection at which the funeral home was located. In the Tureman case, there were stores and other commercial enterprises along a street for a block and a half [613] and 2 filling stations and a grocery store at other locations with-

in the "district." In the Clutter case, the intersection was 3 blocks from the principal business district and the nearest store, and two blocks from a funeral home and a filling station. In the Streett case, the funeral home was the only commercial establishment in the area. Perhaps, an instant area comparable to the areas in the Tureman, Streett and Clutter cases would be the 6 square blocks bounded by Third, Moffet, Sixth and Jackson, in which area are the funeral home and 13 of the tracts owned by 12 plaintiffs (the home of the other plaintiff is just across the street at Fifth and Jackson). In this 3-block-long-and-2-block-wide area are: Thirty-seven single-family residences (including those of two dentists and a music teacher whose offices and studio, respectively, are in their homes), 2 duplexes, 3 small and 2 large apartment buildings and 2 vacant lots. This small area is essentially residential.

In Davis v. Holmes, 189 Miss. 554, 198 So. 25, the court held residential an area of 8 city blocks containing 75 residences, 3 grocery stores, a delicatessen shop and a filling station. Compare also the areas involved in the following cases: Jack v. Torrant, 136 Conn. 414, 71 A. 2d 705 (2 banks, a convalescent home, a dog kennel, and 2 doctors' and one lawyer's offices in their respective homes); Saier v. Joy, 198 Mich. 295, 164 N. W. 507 (a single block).

However, we shall assume without deciding that the instant "district" is not the small Third-Moffet-Sixth-Jackson area above referred to. The Exhibit 14 circle area includes all 6 blocks in the Third-Moffet-Sixth-Jackson area. Also in the circle are: The entire block west of, and most of the 2 blocks northwest and southwest of, the block in which the funeral home is located; also portions of 2 blocks immediately south of Sixth Street and of 3 blocks immediately east of Moffet. Within the circle area (including the residences, duplexes, apartment buildings and vacant lots in the smaller Third-Moffet-Sixth-Jackson area) are: Seventy-eight single-family residences (including those of the two dentists and the music teacher whose office and studio, respectively, are in their homes), 2 large and 7 small apartment buildings, 3 vacant lots, the Y.W.C.A., General Hospital, a church, a cleaning shop, a small coffee shop, and a small two-doctor medical clinic. In our opinion, this Exhibit 14 area constitutes the instant "district" and is essentially residential in character.

The Exhibit 14 circle is in the north central part of the Exhibit 15 area. Exhibit 15 shows that the Exhibit 14 circle area is immediately surrounded by blocks essentially residential. In the Exhibit 15 area (including all of the items listed above as being in the Exhibit 14 circle area) are: One hundred forty-three residences, 20 apartment buildings, General Hospital, Y.W.C.A., 2 churches, the cleaning shop, the coffee shop, the clinic, an insurance agency, a pastry shop, a foods cold storage plant, a large cafe and a beauty shop; also on the north side of Seventh are 6 residences, 2 apartment buildings, 2 filling

stations, a fruit stand, a grocery, a large super market with parking lot, an antique shop and a cleaning shop. However, the locations of the business and commercial establishments in the Exhibit 15 area are significant. Most are upon two of the four streets which bound the area. The north boundary (Third Street), and the area north of that, consists solely of residences and apartments. Along the east boundary (the west side of Byers) are: Thirteen residences (including that of the doctor whose office is in his home), 5 apartments, a church, the Y.W.C.A., a cafe and a vacant lot. (We shall assume that the ''downtown'' business area has reached Byers between Third and Seventh.) The west boundary (the east side of Connor) is entirely residential, and there is but one commercial establishment, a coal yard, on the west side of Connor. The only commercial establishment in the east halves of the 4 Gray-Picher blocks is a roofing company; the west half of the 2 blocks between Third and Fifth are wholly commercial. The pastry shop, insurance agency and cold storage plant on Sixth are within a half block of the east boundary [614] and the beauty shop on Sixth is within a half block of the west boundary.

All of which is most persuasive that, except on Seventh and the west side of Byers, the westward march of business, commerce and industry has ''by-passed'' the 16 square block area shown on Exhibit 15. Certainly, it has ''by-passed'' the Exhibit 14 circle area which we have held is the ''district'' instantly involved. Despite encircling commercial development, the Exhibit 14 circle area retains its original character. We believe that our language in Tureman v. Ketterlin, 304 Mo. 221, 263 S. W. 202, 204[3], most applicable and decisive: ''Appellants [operators of the funeral home], while conceding the soundness of the general doctrine that the maintenance of an undertaking establishment in a residence district of a city constitutes a private nuisance, insist that the district in which they propose to set up their business is not a residence district within its purview. It is true that the district has entered upon a period of transition; no new homes are being built and business is entering here and there. Notwithstanding, it is still essentially residential in character. And on principle there can be no valid reason why its inhabitants are not entitled to the same protection in the enjoyment of their homes as that accorded home owners in residence districts generally. An undertaking establishment stands on a different footing from that of the occasional corner grocery and oil filling station which have made their appearances there. The latter may offend the aesthetic sense of those living in their proximity; the former would destroy, in an essential respect, the comfort and repose of their homes.'' See O'Malley v. Macken, 182 Minn. 294, 234 N. W. 323; Saier v. Joy, 198 Mich. 295, 164 N.W. 507; Fentress v. Sicard, 181 Ark. 173, 25 S. W. 2d 18; White v. Luquire Funeral Home, 221 Ala. 440, 129 So. 84 (involving

**1146**

zoning) ; Rick v. Cramp, 357 Pa. 83, 53 A. 2d 85, 89[5, 6] ; Dillon v. Moran, 237 Mich. 130, 211 N. W. 67.

■ So, the judgment must be reversed and the cause remanded. However, there is in the record a suggestion that plaintiffs' case was moot. The transcript shows the sustention of plaintiffs' objection to a cross-examination inquiry as to whether the area had "been declared to be a business district by the city council." Apparently, the reference was to a zoning ordinance which may have authorized defendant to continue operating the funeral home at its present site. No such ordinance was offered and the matter was not again mentioned. And apparently the trial court did not consider any such ordinance when it ruled that the area was "not strictly and exclusively a residential district." In oral argument here, plaintiffs' counsel stated that "zoning in Joplin came later"—presumably after the petition was filed.

It may be that, as a result of the enactment of a municipal zoning ordinance, the maintenance and operation of the funeral home at its present location is now lawful and proper. If so, our restraint of a common law nuisance (resulting, not from the operation but solely from the location of the funeral home) would be improper and futile. As the record does not affirmatively show that plaintiffs' case was moot, we must remand with directions to the trial court to determine this matter and act accordingly. State ex rel. Brewton v. Board of Education of City of St. Louis, 361 Mo. 86, 233 S. W. 2d 697, 700[5, 6].

The judgment is reversed and the cause is remanded with directions to enter a judgment in accordance with our views herein, but, in the event relief to plaintiffs would be a futile gesture, to dismiss the action. *Van Osdol* and *Coil, CC.,* concur.

PER CURIAM:—The foregoing opinion by LOZIER, C., is adopted as the opinion of the court. All the judges concur.